# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of<br><br>PATRICK JOHN McALLISTER,<br><br>                              Petitioner. | No. 49417-5-II<br><br><br><br>UNPUBLISHED OPINION |

JOHANSON, J. — In this personal restraint petition (PRP), Patrick J. McAllister seeks collateral review of his 2012 jury trial convictions for multiple counts of second and third degree rape and fourth degree assault. McAllister asserts a variety of claims of ineffective assistance of counsel, prosecutorial misconduct, and *Brady*[1] violations. We agree that McAllister's counsel's assistance was deficient and prejudicial when he failed to utilize known exculpatory evidence regarding McAllister's physical limitations, call a sexual assault expert witness, and effectively cross-examine and impeach the victim, SL. We also agree with McAllister that the prosecutor violated *Brady* when he failed to disclose an item of favorable evidence. Accordingly, we hold that McAllister successfully shows actual and substantial prejudice, and we grant McAllister's petition for relief.

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

FACTS

I. BACKGROUND AND PRETRIAL PROCEEDINGS

In March 2010, 21-year-old SL, a resident of the Philippines, arrived in the United States to marry McAllister, then 45 years old. *State v. McAllister*, noted at 183 Wn. App. 1036, 2014 WL 4792936, at *1.[2] SL would later claim that McAllister perpetrated multiple rapes and assaults against her during the period that she resided in McAllister's home as his fiancée. *McAllister*, 2014 WL 4792936, at *1. McAllister was subsequently charged with 10 counts of third degree rape, 18 counts of second degree rape, and 11 counts of fourth degree assault, with each count involving domestic violence.

Before trial, the parties stipulated that no evidence of SL's sexually transmitted diseases (STDs) would be admitted. The trial court also granted the State's motion to bar reference to SL's past sexual behavior, to which McAllister did not object.

II. TRIAL TESTIMONY

A. STATE TESTIMONY

1. SL'S TESTIMONY

SL testified that she met McAllister over the telephone in 2008, through SL's sister's husband, Temur Perkins. At the time, SL lived with her parents in the Philippines. SL and McAllister regularly spoke over the telephone, and SL claimed that McAllister eventually broached the topics of meeting in person in the Philippines and SL coming to America to marry McAllister.

---

[2] Where appropriate, the facts are taken from Division Three's opinion in McAllister's direct appeal.

Around May 2008, McAllister "surprise[d]" SL by visiting her in the Philippines. Report of Proceedings (RP) at 300. McAllister stayed at SL's family home for several days, and then McAllister and SL stayed at resorts together, sharing a room alone for part of this time. When asked if she had an understanding with McAllister as to whether they would "hav[e] sex" during his visit, SL explained that McAllister knew that she would not have sexual intercourse with him until they were married. RP at 304.

After McAllister left, SL agreed to come to America to marry him and stayed with McAllister's friends in Manila for several months while her visa processed. During this time, SL met Gerardo Sabiniano, with whom SL testified she had "take[n] a taxi" to the United States embassy in Manila and who had waited for SL "in the lobby or waiting area" of the embassy while she had an interview. RP at 348-49.

On March 14, 2010, SL arrived at McAllister's home in Brinnon. SL testified that she and McAllister did not have sexual intercourse on the day that she arrived. However, between March 18 and April 25, McAllister repeatedly raped and assaulted her; SL was able to detail the days on which most of the rapes or assaults occurred. For the period between April 4 and April 6, SL claimed that McAllister raped her twice, but she did not "really remember . . . the date" that the rapes occurred. RP at 326. SL also described an attack that occurred in McAllister's bathroom on April 8:

> I was taking a shower in the bathroom. . . . And then he just come over and then he just want to have sex in that bathtub. And then he forced me and it's like take so long in there in the bathtub and then the bathtub is full of water.

RP at 328. And between April 10 and April 25, SL detailed seven rapes.[3] SL explained that McAllister kicked her "hips and . . . butt," always using his right foot. RP at 318.

After McAllister raped SL on April 25, she "decided to go." RP at 335. SL testified that when McAllister left his home on April 26, SL called her sister, Rosemarie Perkins, and 911, and the police came to McAllister's house. SL's testimony was somewhat contradictory in this regard: although she stated that she had told the police "all the story," she also agreed that she had "wait[ed] a few days before" she told anyone. RP at 338.

SL wanted to return home to the Philippines, but the Perkinses convinced SL to stay in the United States. SL explained that she was "nervous" and "scared" when she first spoke to Detective Barb Garrett and that it was "really difficult" for SL to explain what had happened; she admitted that she had not initially told "the whole story" to Detective Garrett. RP at 339-40. However, SL felt that trial was "the time to say the truth" and explain everything that had happened. RP at 296.

Regarding her language proficiency, SL testified that her first language was Waray-Waray, that she was fluent in Tagalog, and that at the time of trial, she was reasonably comfortable speaking English. She had taken English classes since elementary school, but she also testified that when she was 15 years old and had an English-speaking employer, she spoke only "simple English like yes or no." RP at 295. SL had spoken English over the phone with McAllister, and although the conversations would begin with difficulty, after about "an hour, thirty minutes," SL would be comfortable enough to "say what [she] want[ed] to say in English." RP at 298. When

---

[3] Counts 32 through 37 and 40 were based upon this testimony.

SL arrived in America, she had difficulty speaking English because she was "nervous and scared" "talking [to] American people." RP at 295.

On cross-examination, McAllister's attorney requested that SL demonstrate to the jury how McAllister had kicked her. The attorney also questioned SL about her statements at a May hearing that she wanted to stay in the United States if there was a way to do so and that McAllister had kicked her in the head, which SL admitted at trial was not true. SL subsequently clarified that she had said that she wanted to remain in the United States because by the May hearing, she had decided to stay to testify in the case against McAllister.

McAllister's attorney also questioned SL about her notebook, written in Tagalog, that she kept during her time in McAllister's home. In this notebook, SL had written,

> How are you my husband? How's your family? I miss you all. You know my husband, it's only here that I have experienced happiness in all the place that we been to. I especially after seeing and knowing you I've been happier. My husband, I love you so much. Don't forget that I always love you even if I'm far away. You know I always think about you.

RP at 361. SL admitted that this letter was not written to McAllister. She said that she had no husband and that she wrote letters to keep herself busy because she could not talk with anyone.

2.    PERKINSES' TESTIMONY

SL's sister, Rosemarie,[4] testified that their family lived in a small town in the Philippines, and both Rosemarie and Temur confirmed SL's account of "meeting" McAllister over the telephone when McAllister was at the Perkinses' home.

---

[4] For clarity, we refer to Temur and Rosemarie Perkins and Mary Ann and Dennis Omana by their first names.

After SL came to the United States, Rosemarie had little contact with SL until the day that SL called the Perkinses and said that she was "scared of [McAllister]." RP at 207. Temur called 911 to obtain protection for SL while she left McAllister's home, and Rosemarie and Temur went to McAllister's house and brought SL to stay at the Perkinses' home. According to both Rosemarie and Temur, SL had also dialed 911. Rosemarie later brought SL, who was in pain and walking strangely, to a health clinic. Temur testified that SL wanted to return to the Philippines but that he told SL she should stay and "'seek justice.'" RP at 244.

3.    POLICE TESTIMONY

Deputy Adam Newman testified that he and Captain Michael Stringer responded to Temur's 911 call on April 26 and went to McAllister's house, which was located in a small subdivision at the county line. SL appeared "very upset and frightened," although Captain Stringer testified that she had said that she had not been assaulted and was not injured in any way.[5] RP at 265. Deputy Newman similarly was unable to determine whether a crime had been committed "due to the difficult time of contacting [SL]." RP at 273.

Detective Garrett testified that Temur called her and said that after arriving at the Perkinses' home, SL had confided in her sister that McAllister had repeatedly raped her. Detective Garrett interviewed SL four times, with varying degrees of success. On April 28, at the first interview, Rosemarie translated for SL. This interview was "very difficult" because of a language barrier, SL's "extreme[]" nervousness, and Rosemarie's presence. RP at 277, 290. In Detective Garrett's

---

[5] On rebuttal, Captain Stringer testified that he had not heard SL make any statements to McAllister when she left his home; rather, SL had been nervous and appeared not to want to make eye contact with McAllister.

6

experience, having a relative in the room caused witnesses to be reticent, so she attempted to find a translator to conduct another interview. Detective Garrett also referred SL to Harrison Hospital for physical testing.

Detective Garrett's second interview with SL was conducted in Tagalog and was "not successful." RP at 281. Eventually, Detective Garrett found an interpreter who spoke Waray-Waray, and in October 2010, Garrett conducted a third, successful interview. Detective Garrett also interviewed SL a fourth time, in May 2011; she testified that by this time, SL was "quite a bit more fluent" in English, so that the interview was conducted without a translator. RP at 283.

On cross-examination, McAllister's attorney questioned Detective Garrett about SL's interviews, including Garrett's comment in a report that SL's stories changed somewhat. In particular, Detective Garrett had noted that in SL's first interview, SL had said that she "did not enjoy sex with McAllister" on "five" occasions, that McAllister had introduced her to only one of his friends, and that McAllister had raped her on the very first night that they were together. RP at 287.

4. NURSES' TESTIMONY

Jolene Culbertson, a sexual assault nurse at Harrison Medical Center, testified that she examined SL on June 16. SL complained of stomach pain and bleeding for the past two months and told Culbertson that she had been raped and assaulted. Culbertson observed blood-filled lesions in SL's vaginal area that would have caused painful intercourse and referred SL for urgent treatment. Culbertson did not actually observe any active bleeding, and Culbertson could not opine how long the lesions had existed.

7

Wendy White, a Jefferson County Health Department nurse, testified that on June 18, she had examined SL, who was referred to the Health Department. SL was complaining of abdominal pain and bleeding; White observed "bruising" on SL's vaginal area that White agreed was consistent with sexual abuse and indicative of trauma related to sexual abuse. RP at 373. White noted that SL "had indicated" on paperwork that she had not been "hit, kicked, or punched by anyone in the last year." RP at 375. Further, White testified that she could not tell the bruises' age and that sexual trauma was not the "only thing that could cause" the bruising. RP at 376. SL had "indicated that she had been dissatisfied with the previous exam results." RP at 379.

B. DEFENSE TESTIMONY

1. MCALLISTER'S ACQUAINTANCES' AND MOTHER'S TESTIMONY

McAllister's acquaintances Douglas and Kaye Peterson and Kelly Darby all testified that they had not observed anything amiss when they met SL. McAllister had brought his fiancée to a bible study meeting at the Petersons' home sometime in March. Kaye Peterson thought that SL and McAllister seemed "affectionate" toward each other at the meeting; she observed SL putting "her hand on [McAllister's] leg" and the two "h[olding] hands." RP at 403. Similarly, McAllister's friend Darby thought that SL and McAllister seemed "very friendly" and "really close" and observed that SL was playful, happy, and even sang. RP at 409.

Mary Ann testified that she was friends with SL since 2010. Mary Ann's husband, Dennis, recounted that within two or three days of SL's arrival in the United States, the Omanas, SL, and McAllister had gone sightseeing in Seattle together. Dennis thought that SL seemed "happy." RP at 440. Mary Ann testified that during the trip to Seattle, she had asked SL if she and McAllister

had "'sle[pt] together'"; giggling, SL answered affirmatively. RP at 432. Mary Ann and SL spoke over the phone "most of the time" while SL lived in McAllister's home. RP at 435.

McAllister's mother testified that McAllister and SL stayed with her for a week, between April 15 and April 22. During McAllister's mother's testimony, the trial court admitted photographs of SL taken during the trip, in which she appeared happy. McAllister's attorney elicited testimony that SL called McAllister's mother "mom" and that McAllister's mother gave SL a wedding dress, contrary to SL's testimony. RP at 468.

2.    GERARDO SABINIANO'S TESTIMONY

Mary Ann's father, Sabiniano, testified that in 2010, he was living in the Philippines, and Mary Ann asked him to assist SL to come to the United States. Sabiniano had accompanied SL to the embassy; while he waited outside the embassy for SL, he answered SL's cellphone to someone who identified himself as SL's boyfriend. SL told Sabiniano that the caller was "[a] boy . . . of her age" from the Philippines with whom SL was "really in love." RP at 451. Sabiniano claimed that SL had said that her family needed money and that obtaining a visa would help her family financially.

3.    IMMIGRATION ATTORNEY'S TESTIMONY

Immigration attorney Elizabeth Li testified that SL had arrived in the United States under a "K-1 fiancée" visa and explained the options for someone who had such a visa. RP at 488. A fiancée visa allows a "United States citizen to bring over a foreign national who[m] he or she intends to marry" and expires 90 days after the national's entry. RP at 478. At the expiration of the 90-day period, SL could adjust her status to become a permanent resident if she married a United States citizen or she could obtain a "U visa, which is for victims of crime" who "assist in

prosecution of that crime." RP at 480, 482. Li agreed that "the only legal options that [a fiancée visa holder whose engagement was broken off] has would be to either go home to where they were from, or to claim that they were the victim of some sort of crime if they wanted to stay in the United States." RP at 490. A U visa lasts for four years; after three years, the visa holder could petition to become a permanent resident and "stay here forever." RP at 483. Information about fiancée and U visas, including that rape and sexual assault victims could qualify for a U visa, was readily available on the internet.

4.      MCALLISTER'S TESTIMONY

McAllister testified that he had met SL through the Perkinses and discussed coming to visit her in the Philippines "quite a few weeks" in advance of the actual visit. RP at 518. After SL arrived in the United States, McAllister took her to an immigration doctor for tuberculosis testing three times, where SL was examined out of McAllister's presence. McAllister also testified about his and SL's trip to Seattle with the Omanas, where they took "goofy" pictures together in a photo booth; one of these pictures was admitted as a trial exhibit. RP at 538. He claimed that while SL was at his home, she spoke to Mary Ann "on a regular basis." RP at 559.

McAllister claimed that he and SL were consensually "intimate" four or five times at his home and that he did not use force on SL or ever kick SL. RP at 548. McAllister testified that he had an artificial knee that "didn't work right" and that the ankle of the same leg was injured; because of his injuries, McAllister could not work and it was impossible for him move his leg in the way that SL had demonstrated. RP at 512. McAllister's attorney drew attention to McAllister's pronounced limp as he approached the stand.

McAllister claimed that he was shocked when he arrived home on April 26 to see the police at his home. As SL left McAllister's home, she had told him, "'Honey, I didn't want to do this. This wasn't my doing.'" RP at 551-52.

### C. REBUTTAL TESTIMONY

Temur testified that he had observed McAllister walking without a limp on three occasions, including on April 26. On cross-examination, Temur stated that McAllister was "seeking to scam" the Department of Labor and Industries. RP at 584.

SL denied discussing a boyfriend in the Philippines with Sabiniano. According to SL, Sabiniano had waited in a waiting room in the embassy lobby while SL was interviewed for her visa.

SL also admitted that she had been to Seattle and gone on various outings with McAllister, including meeting Darby at a restaurant and going to a bible study. SL denied ever telling Mary Ann about sexual intercourse with McAllister. She claimed that she had spoken to Mary Ann over the phone only once while SL was at McAllister's home and that McAllister refused to allow her to accompany him to his doctor appointments because she would not be inside with McAllister at the appointments. SL explained that she looked happy in photographs because she "pretend[ed]" and because McAllister had told her to "be happy and smile all the time." RP at 594-95. She further claimed to have witnessed McAllister exercising and jumping at his home.

### D. CLOSING ARGUMENT

1. PROSECUTION

In closing, the prosecutor argued that McAllister had pursued a relationship with SL, that he had brought her to his home where he had raped and assaulted her, and that SL had stayed in

the United States in order to pursue justice. The prosecutor claimed that this was not just a case of "her word against his" and referenced Nurse White's and Nurse Culbertson's testimony that SL was in pain as corroborating evidence of SL's allegations. RP at 657.

The prosecutor also challenged McAllister's theory of the case and his credibility; the prosecutor claimed that it was implausible to believe that a young girl had schemed to meet an American man and to make him fall in love with her over the telephone and then had fabricated allegations of rape and assault to obtain a U visa. As for McAllister's witnesses who had testified that SL seemed comfortable in McAllister's presence, the prosecutor asked, "Would you expect a stranger who's in a strange land to come up and tell a friend o[f] the person that's attacking that, oh yeah, by the way, your friend's been raping me[?]" RP at 660. The prosecutor pointed out inconsistencies in the defense witness's stories, including discrepancies in the Omanas' and McAllister's accounts of which day SL had come to visit them after she first arrived in the United States.

In rebuttal closing, the prosecutor emphasized the defense's failure to introduce medical records corroborating his physical limitations: "Wouldn't you expect there to be medical records? Who controls the medical records? . . . He told you, 'I've had a knee replacement.' Did he tell you the date? . . . No doctor to come testify about his mobility." RP at 689-90. The prosecutor also pointed out that not one of McAllister's witnesses had corroborated that McAllister limped or had a leg injury. And the prosecutor argued that the nurses' testimony described blood-filled lesions and damage consistent with sexual trauma that SL could not have "purposely d[one]" to herself. RP at 692.

2.    DEFENSE

The defense argued that "this is a 'he said, she said' case" and that McAllister's version of events was supported by the photographs of SL when she and McAllister were together, inconsistencies in SL's story, and SL's incentive to lie. RP at 664. Regarding the nurses' testimony, McAllister's counsel pointed out that Nurse Culbertson, who examined SL two months after the rapes, could not date the lesions or explain what they were from. And Nurse White could not date the bruising that she observed or explain "what sort of instrumentation caused the bruising." RP at 671. The defense asked the jury to use its common sense about how long bruises lasted.

E.    JURY VERDICT AND DIRECT APPEAL

At the close of the State's case, McAllister successfully moved to have five second degree rape counts and three assault counts dismissed based upon SL's lack of memory of the incidents occurring April 4 through April 6. The jury found McAllister guilty of 10 counts of third degree rape, 13 counts of second degree rape, and 8 counts of fourth degree assault. The trial court subsequently denied McAllister's motion for a new trial.

McAllister appealed his convictions, and in 2014, Division Three of this court reversed one count of rape due to insufficient evidence[6] and affirmed the remaining counts. *McAllister*, 2014 WL 4792936, at *1. In doing so, Division Three rejected McAllister's argument that his counsel "erred in failing to corroborate [McAllister's] testimony concerning his alleged physical

---

[6] Division Three held that there was insufficient evidence to support one of the second degree rapes, which allegedly occurred April 3, because SL had not alleged penetration on that occasion in her testimony but had merely said that McAllister "'attacked'" her. *McAllister*, 2014 WL 4792936, at *11.

deficiencies." *McAllister*, 2014 WL 4792936, at *7. This was so because the record in McAllister's direct appeal included no information that corroborating medical evidence of McAllister's limitations existed or that counsel knew of such evidence. *McAllister*, 2014 WL 4792936, at *7 & n.5 ("If Mr. McAllister is to present such a claim, he will have to proceed by way of a personal restraint petition.").

Division Three issued its mandate on August 14, 2015. In July 2016, McAllister filed this PRP.

G. PRP APPENDICES

1. MCALLISTER'S MEDICAL RECORDS

In McAllister's declaration submitted in support of his PRP, he claims that his attorney ignored McAllister's requests to contact his treating physicians, although McAllister had told his attorney that he was physically incapable of kicking SL. McAllister states that three months before trial, he called his attorney more than 20 times to ask whether his doctors had been interviewed.

Dr. Jeffrey Nacht, the physician who treated McAllister from 2007 to 2011, submitted a declaration that he was never contacted to testify for McAllister. Had he been contacted, Dr. Nacht would have testified that McAllister was "not physically capable of kicking [SL] in the manner she described in her trial testimony" or raping SL in a bathtub. PRP, App. W, at 2-3. Dr. Nacht also observed McAllister's "noticeable limp" between 2008 and 2011. PRP, App. W, Ex. 2, at 2.

McAllister also submitted a March 2010 evaluation by Dr. Richard Thorson, who concluded that McAllister's physical conditions had "worsen[ed]" and endorsed reopening McAllister's Department of Labor and Industries claim. PRP, App. X, at 9. The Thorson evaluation also notes that "[v]ideo surveillance tapes have shown the claimant markedly walking

14

differently and about normally when not observed." PRP, App. X, at 4. The evaluation notes that in 2009, an examiner believed McAllister was "malingering" and concludes that there was a prior "detection of abnormal pain behaviors, perhaps overt malingering with videotape surveillance indicating different ambulation pattern when [McAllister] is not being observed." PRP, App. X, at 4, 8.

Finally, McAllister submitted declarations of several defense witnesses who would have testified that McAllister had physical limitations and walked with a limp.

2.    STD AND SEXUAL ASSAULT EVIDENCE

In his declaration, McAllister states that he "tested negative for any and all STDs." PRP, App. G, at 4. McAllister also relies upon the declaration of Dr. Philip Welch, who does not state whether McAllister has STDs, although he states that "if" McAllister does not have any STDs, SL must have contracted her STD from a different sexual partner.

Dr. Welch further states that he would have testified that the bruising observed by Nurse White could not have been more than two weeks old and could have resulted from consensual sex. And Dr. Welch states that retention of a sexual assault expert would have provided "critical assistance in trial preparation and necessary testimony at trial." PRP, App. Y, at 9.

3.    ADDITIONAL STATEMENTS BY SL

The PRP appendices include the report of the April 28, 2010 interview with SL and Rosemarie, which was conducted in Waray-Waray. Notes of the interview document that SL "said that she came to Washington" on April 6 and that "McAllister wanted to have sex that night." PRP, App. K, at 96. SL "succumbed to his demand and said yes." PRP, App. K, at 96. When Detective Garett asked SL "how many times she did not enjoy sex with McAllister," SL said "five

15

times." PRP, App. K, at 96. SL had also indicated that she did not have any bruising on April 28 but that she sometimes had bruises from McAllister's kicking her.

In June, Detective Garrett again interviewed SL—during this interview, SL stated that she had not "had sex prior to" meeting McAllister, although she "had a [F]ilipino boyfriend" in the past. PRP, App. K, at 168. In an October 2010 interview with Detective Garret, SL stated that McAllister had forced her to have oral sex with him when he visited her in the Philippines.

McAllister also submitted the transcript of a July 2010 hearing at which SL obtained a protection order against McAllister. At this hearing, SL testified that the first rape occurred on the first day that she arrived in the United States, which SL stated was March 17.

In November 2011, SL was interviewed by McAllister's attorneys. SL had not yet decided at the time of the interview whether she would ultimately remain in the United States. She stated that to obtain her fiancée visa, she had to watch a video about human trafficking and further stated that she spoke Tagalog.

McAllister also submitted SL's three-page written statement from May 2010, which Temur had faxed to Detective Garrett on May 11, 2010. The third page includes SL's statement that "April 9th was the last time [McAllister] raped me, we never had sex after that but he continued to kick me frequently." PRP, App. M, Ex. 3, at 4. The prosecutor apparently did not receive the third page from Detective Garrett, and the third page was not provided to McAllister's trial counsel.

ANALYSIS

I. PRPs: Legal Principles

Generally, where a petitioner has had a prior opportunity for judicial review,[7] the petitioner

must show in his PRP "that [he was] actually and substantially prejudiced by constitutional error

or that [his trial] suffered from a fundamental defect of a nonconstitutional nature that inherently

resulted in a complete miscarriage of justice." *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132,

267 P.3d 324 (2011).

When we review a PRP, we have three options: dismiss the petition, transfer the petition

to a superior court for a full determination on the merits or a reference hearing, or grant the petition.

*In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013); RAP 16.11. We dismiss

where a petitioner fails to make a prima facie showing of actual prejudice, we grant the petition if

the petitioner shows actual prejudice, and "a hearing is appropriate where the petitioner makes the

required prima facie showing 'but the merits of the contentions cannot be determined solely on the

record.'" *Yates*, 177 Wn.2d at 18 (quoting *In re Pers. Restraint of Hews*, 99 Wn.2d 80, 88, 660

P.2d 263 (1983)).

II. Ineffective Assistance of Counsel

A. Principles of Law: Ineffective Assistance and PRPs

Ineffective assistance of counsel is an exception from the actual and substantial prejudice

standard: we presume prejudice where a petitioner successfully establishes ineffective assistance

---

[7] We note that although McAllister characterizes many of his claims as having been "raised on appeal," only his witness tampering claim, which we do not address, was raised and rejected on direct appeal. Br. of Pet'r at 7; *see McAllister*, 2014 WL 4792936, at *7. Accordingly, the "actual and substantial prejudice" standard applies to McAllister's claims addressed in this opinion.

of counsel. *In re Pers. Restraint of Lui*, No. 92816-9, 2017 WL 2691802, at *3 (Wash. June 22, 2017). Ineffective assistance of counsel is a mixed question of law and fact that we review de novo. *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 873, 16 P.3d 601 (2001).

To establish ineffective assistance of counsel, a petitioner must generally show that counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. *Yates*, 177 Wn.2d at 35 (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). We indulge a strong presumption that counsel's conduct was reasonable, and we evaluate reasonableness at the time the challenged action was undertaken. *Yates*, 177 Wn.2d at 36. Conduct that may be characterized as legitimate trial strategy or tactics does not constitute deficient performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). Prejudice is a reasonable probability—a probability sufficient to undermine confidence in the outcome—that the result of the proceeding would have differed. *Yates*, 177 Wn.2d at 36.

B.    FAILURE TO UTILIZE KNOWN EXCULPATORY EVIDENCE AND CALL EXPERT WITNESSES

McAllister argues that his counsel rendered ineffective assistance when he failed to utilize known exculpatory evidence and call expert witnesses and that there is a reasonable probability that the outcome would have differed had he done so. We agree.

1.    PHYSICAL LIMITATIONS

McAllister argues that his counsel failed to use known exculpatory evidence, including McAllister's own medical records, or to hire an expert or have McAllister's own physician testify about McAllister's physical limitations, including that he could not hold down and rape SL or kick her as she described. Relatedly, McAllister argues that his trial counsel was ineffective when he

failed to elicit testimony from other defense witnesses about McAllister's physical limitations. And McAllister contends that along with evidence of his physical limitations, evidence of his bathroom layout would have revealed he was physically incapable of assaulting SL in the bathtub as she claimed.

The State acknowledges that in hindsight, McAllister's counsel should have made more of McAllister's physical limitations, although the State notes that some medical evidence could have been damaging to the defense. The State argues that McAllister's counsel made a tactical decision to focus on inconsistencies in SL's testimony, other witnesses' testimony and photographs showing SL as happy, her denial of being assaulted when she spoke to police officers, the U visa, and her boyfriend in the Philippines. We agree with McAllister.

At trial, SL described multiple times that McAllister had kicked her and explained that McAllister had always kicked her hips and butt using his right foot; SL demonstrated the way that McAllister had kicked her to the jury. When McAllister testified, he explained that it was impossible for him to move his leg in the way that SL had demonstrated because of his physical limitations. McAllister's attorney also drew attention to McAllister's pronounced limp as he approached the stand. Notably, no defense witnesses other than McAllister testified regarding his physical limitations.

During the State's rebuttal testimony, Temur testified that he had observed McAllister walking without any limp on three occasions, including on April 26. And Temur stated on cross-examination that McAllister was not actually injured but was "seeking to scam" the Department of Labor and Industries. RP at 584. In closing, the prosecutor capitalized on the fact that only McAllister had testified about his injuries—the prosecutor emphasized the defense's failure to

19

introduce any medical records corroborating McAllister's physical limitations, to call his physician to testify that he had a leg injury, or to elicit testimony from other witnesses regarding McAllister's leg injury.

On collateral review, McAllister relies upon his personal physician's declaration and the Thorson evaluation. The declaration establishes that McAllister's physician would have testified at trial that McAllister was not physically capable of raping SL in a bathtub or kicking SL in the manner that she described. McAllister also submits declarations of several defense witnesses, who would have testified that McAllister had physical limitations and walked with a limp, if McAllister's counsel had asked. Further, defense witnesses Darby and Arthur Mina would have testified that McAllister could not have kicked SL.

a.    DEFICIENT PERFORMANCE ANALYSIS

To establish ineffective assistance of counsel, McAllister must first establish deficient performance—that his trial counsel's failure to use the evidence of physical limitations fell below an objective standard of reasonableness. *See Yates*, 177 Wn.2d at 35. Here, McAllister's trial counsel introduced *some* evidence of McAllister's limitations:  namely, McAllister's own testimony and his pronounced limp as he approached the stand. However, McAllister contends that his counsel should have done more by introducing corroborating medical evidence, the testimony of an expert such as his own physician, or even the testimony of those who were familiar with McAllister's limitations.

The State points out that the evaluation upon which McAllister relies would have been damaging to the defense and would have shown that McAllister was believed to be exaggerating his physical limitations and even "malingering." PRP, App. X, at 4. Thus, the State argues that

McAllister's attorney's decision not to introduce evidence of McAllister's physical limitations was strategic and intended to avoid eliciting damaging evidence. *See Grier*, 171 Wn.2d at 33. But this argument fails—even if defense counsel's decision not to utilize additional evidence of McAllister's physical limitations was intended to avoid eliciting evidence of malingering, this justification evaporated when Temur testified on rebuttal that McAllister was "scamming" the Department of Labor and Industries. At the very least, McAllister's counsel should have elicited testimony from his acquaintances to provide *some corroboration* of McAllister's physical limitations other than his own testimony. No legitimate tactical or strategic reason justifies counsel's failings in this regard, and McAllister has shown deficient performance. *See Grier*, 171 Wn.2d at 33.

    b.    PREJUDICE ANALYSIS

Next, McAllister must show prejudice—a reasonable probability that the outcome would have differed had his counsel taken the actions that McAllister advocates. *See Yates*, 177 Wn.2d at 36. After the State's rebuttal testimony, without any contrary evidence, the jury was left with the picture of McAllister as not only a liar who attempted to defraud the Department of Labor and Industries but also someone who was physically capable of kicking SL in the manner that she claimed. And this prejudice was emphasized in closing, when one of the last things the jury heard was the prosecutor's argument that if McAllister truly was physically limited, he would have produced corroborating medical records and testimony. Under these circumstances, McAllister succeeds in showing a reasonable probability that the outcome would have differed and accordingly establishes the requisite prejudice. *See Yates*, 177 Wn.2d at 36.

We hold that McAllister has shown deficient performance and prejudice with regard to his counsel's failure to introduce exculpatory evidence, including expert testimony, corroborating McAllister's physical limitations. Thus, McAllister succeeds in showing actual and substantial prejudice in this regard. *See Lui*, 2017 WL 2691802, at *3.

2.      SL's STD and Physical Injury Evidence

McAllister argues that his counsel should not have stipulated to exclude STD evidence, so that McAllister could argue that SL's STD, and not the rapes, caused the bruising, pelvic pain, and bleeding that Nurses Culbertson and White observed. McAllister argues that his counsel should have introduced evidence that the nurses' examinations revealed that SL suffered from an untreated STD and that McAllister did not have an STD. And McAllister contends that an expert could have testified that the pelvic pain and bleeding that SL complained of could have been caused by her untreated STD and that the observed bruising was not necessarily indicative of sexual abuse. Finally, in a related argument, McAllister claims that his trial counsel should have more effectively cross-examined Nurses Culbertson and White.

The State responds that McAllister had strategic reasons for not raising STD issues and, obliquely, that it was not ineffective assistance to fail to hire a sexual assault expert. The State further responds that evidence about SL's STD would have been barred as irrelevant or under the rape shield statute. We agree with McAllister.

In evaluating a claim of ineffective assistance, one federal court held that in sexual abuse cases,

> because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance. . . . This is particularly so where the prosecution's case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged victim, as opposed to direct physical evidence.

22

*Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005).  The rape shield statute bars "[e]vidence of the victim's past sexual behavior . . . on the issue of credibility and . . . to prove the victim's consent."  RCW 9A.44.020(2).  But the rape shield statute does not bar the use of prior sexual behavior evidence "for purposes other than to prove credibility or consent."  *State v. Posey*, 130 Wn. App. 262, 276, 122 P.3d 914 (2005), *rev'd in part on other grounds*, 161 Wn.2d 638, 167 P.3d 560 (2007).

Before McAllister's trial, the parties stipulated to exclude mention of SL's STD.  At trial, Nurse Culbertson, who had examined SL on June 16 at Harrison Medical Center, testified that SL had stated that her stomach hurt and that she had suffered from vaginal bleeding for the past two months.  Culbertson observed "blood filled lesions" in SL's vaginal area that would have caused painful intercourse, although Culbertson acknowledged that she could not verify how long the lesions had existed.  RP at 389.  On cross-examination, McAllister's counsel elicited from Nurse Culbertson testimony that she had not actually observed any active bleeding and that Culbertson could not verify how old the lesions were.

Nurse White, who had examined SL on June 18 for the Jefferson County Health Department, testified that SL had complained of abdominal pain and bleeding.  White observed "bruising" on SL's vagina that White agreed was indicative of trauma related to sexual abuse.  RP at 373.  On cross-examination, White admitted that she could not date the bruising and that sexual trauma was not the only possible cause of the bruising, although she did state that she did not think that consensual intercourse could cause such bruising.  McAllister's counsel did not object during either nurse's testimony; neither did he elicit testimony regarding other potential causes of SL's complained-of abdominal pain and bleeding.

McAllister relies upon his own declaration that he is free of STDs. He further relies on Dr. Welch's declaration that states that the bruising observed by Nurse White could not have been more than two weeks old and could have been from consensual sex and that SL's STD was most likely contracted before she arrived in the United States. According to Dr. Welch, "if" McAllister did not have any STDs, SL necessarily must have contracted her STD from a different sexual partner. But Dr. Welch does not state that McAllister has no STDs—only that he has "received no medical records that indicate that [McAllister] had contracted or been treated for genital warts at any time." PRP, App. Y, at 6. Dr. Welch also states that retention of a sexual assault expert would have provided "critical assistance in trial preparation and necessary testimony at trial." PRP, App. Y, at 9.

a.      DEFICIENT PERFORMANCE ANALYSIS

McAllister must establish deficient performance—that his trial counsel's exclusion of the STD evidence and failure to contest that SL's symptoms were indicative of sexual assault fell below an objective standard of reasonableness. *See Yates*, 177 Wn.2d at 35. Here, there is no apparent legitimate tactical or strategic reason to support McAllister's counsel's decision to stipulate that evidence of SL's STD was inadmissible for all purposes. The rape shield statute would not bar the admission of STD evidence to explain the *source* of SL's symptoms. *See* RCW 9A.44.020(2); *Posey*, 130 Wn. App. at 276.

Further, STD evidence would have been relevant. Collectively, the nurses' testimony conveyed to the jury that SL had stomach pain and vaginal bleeding, blood-filled lesions of an indeterminate age that would have caused painful intercourse, and bruising likely caused by nonconsensual intercourse. The nurses did not explicitly state that the symptoms other than the

bruises were indicative of sexual assault. However, the prosecutor's closing argument heavily implied that SL's pain and blood-filled lesions were symptomatic of sexual assault, particularly when the prosecutor stated that SL could not have self-inflicted the blood-filled lesions and damage consistent with sexual trauma. Indeed, without knowing that SL suffered from an untreated STD, the jury would likely have reasoned that all of SL's symptoms resulted from sexual assault.

The use of a sexual assault expert would have assisted the defense in several respects. The Welch declaration establishes that such an expert could have, at the very least, contradicted that the bruising was evidence of sexual assault. And in conjunction with more effective cross-examination, a sexual assault expert could have pointed out to the jury that the nurses' testimony never explicitly linked the abdominal pain, bleeding, and blood-filled lesions to sexual assault and that there could have been other explanations for these symptoms.

An expert could further have explained that the bruises could have been from consensual sex. No legitimate tactical reason supports the failure to introduce evidence that the bruises could not be more than two weeks old, thus ruling out McAllister as the source of the bruising that Nurse White observed. Without such evidence, McAllister's counsel was left to rely in closing argument on "common sense" notions that bruises do not last for two months: evidence that the jury was instructed to ignore. RP at 671. For these reasons, we hold that McAllister has shown deficient performance. *See Grier*, 171 Wn.2d at 33.

    b.    PREJUDICE ANALYSIS

Next, McAllister must show prejudice—a reasonable probability that the outcome would have differed. *See Yates*, 177 Wn.2d at 36. Here, in closing argument, the prosecutor relied upon

25

the symptoms observed by the nurses to argue that physical evidence corroborated SL's claims: "She tells you that the sex was painful. . . . Wendy White with the Nursing Health Department, and Jolene Culbertson from Harrison Sexual Assault Nurse Examiner program tells you that sex, consensual or not consensual would hurt (inaudible) hurt." RP at 657. On rebuttal, the prosecutor further argued that SL did not inflict the bruising observed by White or the blood-filled lesions observed by Culbertson on herself, implying that McAllister had raped SL and caused these injuries. The prosecutor also claimed that it was unlikely that consensual sex would have caused the bruising that White observed.

The stipulation to exclude STD evidence, failure to call a sexual assault expert, and inadequate cross-examination were reasonably likely to have affected the outcome of the proceeding, particularly in light of the failure to introduce evidence of McAllister's physical limitations noted above. *See Yates*, 177 Wn.2d at 36. The nurses' testimony implied that SL's pelvic pain and bleeding were caused by sexual assault and that McAllister had raped SL, causing her bruises. The prosecutor drew the jury's attention to this in closing, when he argued that SL did not self-inflict bruises or blood-filled lesions and that the pain that SL complained of was corroborating evidence of sexual abuse. Thus, calling a sexual assault expert would have served to rebut the only physical corroborating evidence in a case turning on which of two conflicting versions of events the jury believed and would have been likely to result in a different verdict. *See Yates*, 177 Wn.2d at 36.

McAllister has shown ineffective assistance of counsel. Thus, McAllister succeeds in showing actual and substantial prejudice and prevails in this regard. *Lui*, 2017 WL 2691802, at *3.

## C. FAILURE TO EFFECTIVELY CROSS-EXAMINE AND IMPEACH SL

McAllister makes a number of arguments that his counsel failed to effectively cross-examine SL. McAllister relies upon the failure to impeach SL with the following[8]: her testimony at a protection order hearing that the first rape occurred on March 17, her statements to Detective Garrett that McAllister forced her to have oral sex with him when he visited the Philippines and that she had no bruises on April 28, her contradictory statements to Detective Garrett about whether she had a boyfriend in the Philippines before meeting McAllister, and her original inability to remember the first time that McAllister kicked her. The State argues that every issue was a "trial strategy determination[]" and thus not defective performance. Br. of Resp't at 19. We agree with McAllister that his counsel's cross-examination of SL was ineffective assistance of counsel.

"Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel. . . . [W]e need not determine why trial counsel did not cross-examine if that approach falls within the range of reasonable representation." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 720, 101 P.3d 1 (2004). "In order to establish prejudice" from

---

[8] Some of McAllister's claimed cross-examination deficiencies involve testimony that was in fact elicited at trial by McAllister's counsel. Namely, McAllister's counsel asked SL on cross-examination about her earlier statements that she wanted to stay in the United States and elicited from Detective Garrett that SL had claimed to have met only "one" of McAllister's friends, RP at 287, that SL had initially claimed to have been raped only "five" times, RP at 290, and that SL had at one point claimed that McAllister had raped her on the first night that she came to the United States. McAllister's counsel attempted to inquire about SL's denial of being abused during her immigration doctor appointment on April 5 but properly pursued another line of questioning when SL did not recall the visits. And McAllister acknowledges that his counsel did inquire about SL's claim that she stayed with her grandmother. Thus, McAllister cannot show that his counsel rendered deficient performance in these regards.

deficient cross-examination, the petitioner must show that the testimony to be elicited "could have overcome the . . . evidence against him." *Davis*, 152 Wn.2d at 720.

     a.    DEFICIENT PERFORMANCE

To show ineffective assistance of counsel, McAllister must show that his counsel's performance fell below an objective standard of reasonableness. *See Yates*, 177 Wn.2d at 35. Despite the general rule that the reviewing court defers to counsel's professional discretion in cross-examination, here, the record shows no legitimate tactical or strategic reasons for counsel not to have brought out these various inconsistencies in SL's story. *See Davis*, 152 Wn.2d at 720. Notably, counsel *did* cross-examine SL about some of her statements at the protection order hearing, making it curious that counsel would then decline to ask SL about her inconsistent statement at the hearing that McAllister had forced her to have sex with him "on the 17[th of March,] the first time [she] arrived here in [the] U.S." PRP, App. K, at 108.

McAllister successfully shows that his counsel's performance fell below an objective standard of reasonableness when McAllister failed to cross-examine SL sufficiently to elicit a number of inconsistencies in her account. *See Yates*, 177 Wn.2d at 35. Accordingly, we hold that McAllister's counsel's performance was deficient.

     b.    PREJUDICE

Next, McAllister must show a reasonable probability that the outcome of the proceeding would have differed had his trial counsel cross-examined SL regarding the inconsistencies that McAllister points out. *See Yates*, 177 Wn.2d at 36. That is, McAllister must show that the testimony to be elicited "could have overcome the . . . evidence against him." *Davis*, 152 Wn.2d at 720.

28

Here, although perhaps each individual error evaluated in isolation would not be enough to overcome the evidence against McAllister, taken together, the defects in trial counsel's cross-examination of SL could well have collectively been enough to overcome the evidence against him.[9] This is particularly true where the jury's determination of McAllister's guilt rested primarily upon its evaluation of SL's credibility and where McAllister's counsel was deficient in the regards described above.

We hold that McAllister shows that his counsel rendered ineffective assistance of counsel in his cross-examination of SL. Thus, McAllister shows actual and substantial prejudice in this regard. *Lui*, 2017 WL 2691802, at *3.

D. CONCLUSION: INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

For the reasons discussed above, McAllister has established ineffective assistance of counsel related to his counsel's failure to introduce testimony and evidence regarding McAllister's physical limitations, his exclusion of STD evidence and failure to call a sexual assault expert regarding SL's untreated STD and physical injuries, and his failure to effectively cross-examine

---

[9] The State is correct that McAllister fails to show any prejudice from several asserted cross-examination deficiencies. A review of the record reveals no possible prejudice from failure to ask SL about her statement to Rosemarie that she would "rather die" than return to the Philippines after McAllister had raped her, PRP, App. aa, her consultation with an immigration attorney, her failure to answer a question about her sexual activity on an intake form, and her admission that she had to watch a video about human trafficking in order to obtain her fiancée visa. McAllister makes much of SL's inability to understand English and difficulties communicating in Waray-Waray and Tagalog during respective interviews with her sister and a Tagalog interpreter. But there was no prejudice from the failure to bring out these facts because SL's inability to understand English was explained by multiple accounts that her English was better when she was comfortable and worse when she was "nervous and scared." RP at 295. Also, SL's difficulties during the interviews were attributable to reluctance to discuss sexual abuse in front of her family and problems with the Tagalog interpreter.

SL. Because McAllister succeeds in showing ineffective assistance of counsel, McAllister has met his burden to show actual and substantial prejudice, and we grant McAllister's PRP. *See Yates*, 177 Wn.2d at 17; *Lui*, 2017 WL 2691802, at \*3.

### III. *BRADY* VIOLATION

In addition to his ineffective assistance of counsel claims, McAllister argues that the State violated *Brady* when it failed to disclose certain evidence. We agree with McAllister regarding one of his *Brady* claims.[10]

### A. PRINCIPLES OF LAW: *BRADY* AND PRPs

A petitioner claiming a *Brady* violation—and thus a violation of due process—must show actual and substantial prejudice to prevail. *See* 373 U.S. at 87; *Coats*, 173 Wn.2d at 132. We review de novo a claimed *Brady* violation. *State v. Mullen*, 171 Wn.2d 881, 893-94, 259 P.3d 158 (2011).

"[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Both impeachment and exculpatory evidence must be disclosed; the scope of the duty includes the prosecutor's "'duty to learn of any favorable evidence known to the others acting on the government's behalf . . . including the police.'" *Strickler v. Greene*, 527 U.S. 263, 281, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)); *United States v. Bagley*, 473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

---

[10] Thus, we do not address McAllister's remaining *Brady* claims.

Thus, to establish a *Brady* violation, the petitioner must show three elements: that the evidence was favorable to the accused, that the State willfully or inadvertently suppressed the evidence, and that prejudice ensued because there is a reasonable probability that the outcome would have differed had the prosecution disclosed the evidence to trial counsel. *Lui*, 2017 WL 2691802, at *3; *Strickler*, 527 U.S. at 281-82. In evaluating whether the outcome would have differed, we weigh the evidence in the context of the entire record. *United States v. Price*, 566 F.3d 900, 913 (9th Cir. 2009).

Similarly to a claim of ineffective assistance of counsel, the prejudice element of a petition is established by showing a "reasonable probability that the outcome of the proceedings would have been different" absent the *Brady* violation. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 845, 280 P.3d 1102 (2012).

### B. THIRD PAGE OF SL'S MAY 10, 2010 WRITTEN STATEMENT

McAllister argues that the third page of SL's written statement was never provided to the defense. McAllister contends that the third page of the document was favorable to the defense because the sophistication with which it was written could have been used to impeach SL and because the third page of the document contradicted SL's trial testimony regarding the last day McAllister raped her. And McAllister contends that the State suppressed the evidence because Detective Garrett had the third page in her possession. We agree.[11]

On collateral review, McAllister submits an August 2011 e-mail from the prosecutor to Detective Garrett, in which the prosecutor states that he has the first two pages of SL's May 10

---

[11] The State does not address these arguments.

31

statement but not the third page. McAllister also submits his trial counsel's declaration that he did not receive the third page of the statement.

Had McAllister received the third page of the statement, it would have provided invaluable impeachment evidence. The third page of SL's statement details that "April 9th was the last time [McAllister] raped me, we never had sex after that but he continued to kick me frequently." PRP, App. M, Ex. 3, at 4. This statement contradicts SL's trial testimony, during which SL recounted April 25 as the last time that McAllister had raped her and claimed that after April 25, "that time that's the really last time that I like, I have to go. I have to do something. I need to get out [of] here." RP at 335. Further, McAllister's evidence shows that Detective Garrett had the entire statement as of May 11, 2010, so that the State suppressed the third page. *See Strickler*, 527 U.S. at 281. We hold that McAllister has established that the failure to disclose the third page of SL's written statement amounts to the suppression of favorable evidence.

## C. PREJUDICE

McAllister identifies an item of evidence that was favorable to the defense and suppressed by the State: the third page of SL's written statement. We hold that there was a reasonable likelihood that the outcome of the case would have differed had this item been disclosed and accordingly that McAllister establishes a *Brady* violation.

We consider the prejudicial effect of this evidence in the context of the entire record. *Price*, 566 F.3d at 913. Here, on the first two pages of the written statement, SL states that McAllister raped her beginning on March 18 and that McAllister raped her between March 21 and April 9 whenever she refused vaginal intercourse. But it is not until the undisclosed third page that SL states that "April 9th was the *last time he raped me*, we never had sex after that but he continued

32

to kick me frequently." PRP, App. M, Ex. 3, at 4 (emphasis added). This statement contradicted SL's trial testimony that the last rape occurred on April 25, prompting SL to call Rosemarie and 911 on April 26, and would have been extremely damaging to SL's credibility, particularly because seven of McAllister's rape convictions were based upon rapes occurring after April 9.

We hold that McAllister establishes a *Brady* violation and accordingly actual and substantial prejudice. *See Coats*, 173 Wn.2d at 132; *Crace*, 174 Wn.2d at 845.

## IV. CONCLUSION

Of McAllister's many arguments that he received ineffective assistance of counsel, several merit that his petition for relief be granted: his claims of failure to utilize known exculpatory evidence, such as his doctor's testimony regarding his physical limitations, the failure to call a sexual assault expert and the exclusion of STD evidence, and the failure to effectively cross-examine SL. In addition, McAllister successfully establishes a *Brady* violation. Either the ineffective assistance of counsel claim or the *Brady* violation standing alone merits granting McAllister's petition.

Our Supreme Court has directed that, in applying the test for ineffective assistance of counsel, a reviewing court must ultimately focus its inquiry on the "'fundamental fairness of the proceeding'" rather than rigidly and mechanically applying *Strickland*'s guidelines. *State v. Estes*, ___ Wn.2d ___, 395 P.3d 1045, 1049 (2017) (quoting *Strickland*, 466 U.S. at 696). Guided by this principle, we focus on the effect of McAllister's counsel's errors, which collectively barred the jury from hearing evidence that would have (1) corroborated McAllister's testimony that he was physically unable to kick and rape SL as she claimed, (2) explained that at least some of SL's physical symptoms could not have been caused by sexual assault, and (3) established that SL's

story was inconsistent in many regards. McAllister's counsel's failings and the *Brady* violation, involving the withholding of information that would have contradicted SL's account of the very dates on which she claimed that she was raped, served to bolster SL's account and impair McAllister's credibility in such a manner as to remove any doubt that McAllister's trial was not fair. In light of these multiple prejudicial errors, we hold that McAllister has established actual and substantial prejudice such that his convictions should be reversed and the matter remanded.

We grant McAllister's petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

WORSWICK, J.

BJORGEN, C.J.